23CA1863 Peo v Sharpe 03-19-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1863
Chaffee County District Court No. 22CR139
Honorable Lynette M. Wenner, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher Marc Sharpe,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Kuhn and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 19, 2026

---

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Cynthia A. Harvey, Alternate Defense Counsel, Aurora, Colorado, for Defendant-Appellant

¶ 1     Defendant, Christopher Marc Sharpe, appeals his conviction for stalking under section 18-3-602(1)(c) and (3)(b), C.R.S. 2025. Sharpe argues that (1) the evidence was insufficient to find that he surveilled the victim; and (2) the conviction violates his First Amendment rights under *Counterman v. Colorado*, 600 U.S. 66 (2023).  For the reasons below, we affirm.

## I.     Background

¶ 2     T.I. moved to Buena Vista, Colorado with her son in October 2020.  Hoping to meet people in the community, T.I. accepted Facebook friend requests from people with mutual connections even though she had never met them.  In May 2022, T.I. received a friend request from Christopher Sharpe of Lakewood, Colorado.  She accepted the request and Sharpe directly messaged her.  After only one day, Sharpe expressed interest in T.I. and said he could not wait to meet her in person.   This made T.I. uncomfortable and she told Sharpe that she was not interested in a long-distance relationship.  Ignoring this, he replied:

> Are you willing to actually have a relationship
> with myself, because if that's the case, I do
> and really am interested in you and would like
> to put a ring on your finger possibly have
> another child.  But, at this moment, I feel this

1

> is moving too quick even with my ability to
> move quickly.

¶ 3    T.I. said, "[n]o, no, no," but continued to occasionally respond to Sharpe's messages throughout May.  Sharpe told T.I. he wanted to be in her life and planned to take time off work to visit her.  He also inquired about her son, her time and location of birth, and asked if he was being punished when she did not respond.  T.I. repeatedly expressed her disinterest in a relationship with Sharpe and eventually blocked him.

¶ 4    As a precaution, T.I. called the police for advice.  They suggested keeping copies of Sharpe's messages, which T.I. could only do if she unblocked him on Facebook.  When she did so, Sharpe barraged her with more messages and said he knew who she was dating.  T.I. again blocked him after copying the messages.  Undeterred, Sharpe sent friend requests to T.I.'s sister and friends.  Two police officers then contacted Sharpe and he signed a directive agreeing to not directly or indirectly contact T.I.

¶ 5    This did not dissuade Sharpe.  Shortly after signing the directive, he found T.I.'s phone number on her photography Facebook page and called her.  T.I. then received Facebook

messages from "Raven Adams," who shared that Sharpe remained very interested in her and "trie[d] to find anyone and everyone who might know [T.I.]." T.I. continued to deny friend requests from accounts with the name "Christopher Sharpe" and she learned from "Raven Adams" that Sharpe was making fake profiles "just so he could look at [T.I.] and chat with [her]." T.I. also received messages from "Bee Bee" relaying similar information.

¶ 6    The "Raven Adams" and "Bee Bee" accounts were fake. Briana Holte, Sharpe's on-again-off-again-girlfriend, operated both. At trial, Holte testified about Sharpe's obsession with T.I. She disclosed that Sharpe asked her to befriend people close to T.I. so he could monitor T.I. via Holte and stated that she saw Sharpe using a fake account to surveil T.I.'s profile. Holte also relayed that Sharpe saved Facebook photos of T.I. and her son onto his phone.

¶ 7    T.I. informed her coworkers and friends about Sharpe's conduct. She changed her route to work, kept her curtains closed, switched her social media account settings to "private," and stopped meeting people in the community. She would not let her son play outside without a trusted adult, did not enroll him in sports, and

3

refused to participate in after-school events. T.I. even considered purchasing a gun to "protect [her]self and [her] son."

¶ 8 The People charged Sharpe with one count of stalking - second offense under section 18-3-602(1)(c) and (3)(b). The jury convicted Sharpe as charged and, after a bifurcated proceeding regarding a prior stalking conviction, the trial court sentenced him to six years in the Department of Corrections' custody.

¶ 9 Sharpe argues on appeal that the evidence was insufficient to find that he surveilled T.I. He also contends that the conviction violates his First Amendment rights because it is based on protected speech. Because the trial took place before the Supreme Court decided *Counterman*, a "true threats" stalking case, Sharpe asks us to reverse his conviction because the jury was not instructed on the "recklessness" mental state the Court established. *Counterman*, 600 U.S. at 69. We disagree and affirm the judgment of conviction.

## II. Surveillance-Based Stalking

### A. Standard of Review

¶ 10 "[S]ufficiency of the evidence claims may be raised for the first time on appeal and are not subject to plain error review." *McCoy v.*

4

*People*, 2019 CO 44, ¶ 27.  Thus, we review the record de novo in unpreserved sufficiency claims to determine whether the evidence "viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt."  *People v. Harrison*, 2020 CO 57, ¶ 32 (citation omitted).  However, we "may not serve as a thirteenth juror and consider whether [we] might have reached a different conclusion than the jury."  *Id.* at ¶ 33.

### B.    Applicable Law and Analysis

¶ 11    A defendant is guilty of stalking if "directly, or indirectly through another person," he knowingly and repeatedly "follows, approaches, contacts, [or] places [the victim] under surveillance . . . in a manner that would cause a reasonable person to suffer serious emotional distress."  § 18-3-602(1)(c).  While "surveillance" is not statutorily defined, its common meaning is "close watch kept over someone," Merriam-Webster Dictionary, https://perma.cc/7995-2YRC, or "close observation or listening of a person or place in the hope of gathering evidence," Black's Law Dictionary 1752 (12th ed. 2024).  *See Robbins v. People*, 107 P.3d 384, 387 (Colo. 2005)

5

(words and phrases are "given effect according to their plain and ordinary meaning"). The defendant need not be physically present and may surveil the victim electronically. *People v. Sullivan*, 53 P.3d 1181, 1184 (Colo. App. 2002); *see also People v. Crawford*, 2025 CO 22, ¶ 4 (using the word "surveil" to describe the defendant's use of online resources to learn information about the victim).

¶ 12    Here, the evidence was sufficient for the jury to reasonably conclude that Sharpe repeatedly contacted and surveilled T.I. *See Sullivan*, 53 P.3d at 1184; *Crawford*, ¶ 4. Sharpe used Facebook to find her phone number and learn who she was dating and, after T.I. blocked him, created numerous profiles hoping to see content accessible only to T.I.'s Facebook friends. Holte testified that Sharpe used Facebook to see what T.I. was doing and downloaded T.I.'s Facebook pictures onto his phone. She also saw him looking at T.I.'s profile under an alias. Further, Sharpe sent friend requests to T.I.'s friends and family and regularly attempted to contact her. This conduct caused T.I. to change her daily habits and fear for her own safety and her son's welfare. This evidence, taken together and viewed in a light most favorable to the People, is sufficient for a

6

reasonable jury to conclude that Sharpe placed T.I. under surveillance. *See Sullivan*, 53 P.3d at 1184; *Crawford*, ¶ 4; *see also People v. Brown*, 2014 COA 130M, ¶¶ 46-50 (concluding that the defendant surveilled the victims through recorded videos and this was sufficient to support his stalking conviction).

### III. Jury Instruction

#### A. Additional Background

¶ 13 Before trial, Sharpe moved to dismiss the case on First Amendment grounds, arguing that his speech was not a true threat. He previewed that *Counterman*, a true-threats case concerning Colorado's stalking statute, was pending before the Supreme Court and posited that the Court's adoption of a "recklessness" mens rea would facially invalidate the statute. The People countered that the content of the Facebook messages did not form the primary basis of the charge; rather, their theory hinged on Sharpe's repeated attempts to contact and surveil T.I. Thus, the totality of Sharpe's conduct — not his speech alone — caused T.I. distress. The trial court agreed with the People and denied Sharpe's motion.

¶ 14 Sharpe later requested a jury instruction on true threats. He did not ask the court to instruct the jury that, to find him guilty of

stalking for uttering a true threat, he must have acted recklessly. He instead asked for the then-existing objective standard articulated by the Colorado Supreme Court in *People in Interest of R.D.*, 2020 CO 44, ¶ 4, *abrogated in part by Counterman*, 600 U.S. at 78. The trial court gave a modified version of this proposed instruction.

¶ 15    After trial but before sentencing, the Supreme Court announced *Counterman*. The Court adopted a "recklessness" standard requiring the prosecution to show that "the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69. Sharpe renewed his motion to dismiss, arguing that he had been prosecuted under the objective standard *Counterman* disavowed. The People maintained that his conviction was valid because *Counterman* affected speech-based — rather than conduct-based — grounds for stalking, and in any event, Sharpe could raise an instructional challenge on appeal. The trial court again agreed with the People and denied Sharpe's motion.

¶ 16    Sharpe argues that his conviction for stalking violates the First Amendment because the jury was not instructed on the

"recklessness" standard *Counterman* established. The People concede that to convict Sharpe of stalking for his speech, the court should have instructed the jury accordingly. However, the People reiterate that Sharpe's repeated, unwelcome conduct informed the prosecution's theory and argue that any instructional error was harmless because there is not a reasonable possibility the jury would have concluded differently had it received a *Counterman* instruction. Based on the evidence presented, we agree with the People.

## B.     Standard of Review

¶ 17     "The trial court has broad discretion to formulate jury instructions as long as they are correct statements of the law." *People v. Carter*, 2015 COA 24M-2, ¶ 39 (quoting *People v. Oram*, 217 P.3d 883, 893 (Colo. App. 2009), *aff'd*, 255 P.3d 1032 (Colo. 2011)). While we review de novo whether jury instructions accurately inform the jury of the governing law, we review the trial court's decision to give a particular instruction for an abuse of discretion. *Id.*

¶ 18     Because the alleged omission of a mens rea element from a jury instruction implicates the defendant's right to due process, we

apply the constitutional harmless error standard. *People v. Novotny*, 2014 CO 18, ¶ 20. "A constitutional error is harmless when the evidence properly received against a defendant is so overwhelming that the constitutional violation was harmless beyond a reasonable doubt." *People v. Walker*, 2022 COA 15, ¶ 23 (citation omitted).

C.    Applicable Law and Analysis

¶ 19    True threats are "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence'" and are not entitled to First Amendment protection. *Counterman*, 600 U.S. at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)); *People v. Morris*, 2025 COA 15, ¶ 26. In true-threats cases, the People must prove that the defendant had some subjective understanding of the statement's threatening nature, but a mental state of recklessness is sufficient. *Counterman*, 600 U.S. at 69. This constitutional requirement is limited to stalking charges premised on the defendant's speech. *Crawford*, ¶ 23 ("The *Counterman* Court limited its review to defining the bounds of the First Amendment's true-threats exception and did not consider Colorado's stalking statute outside of that context."); *accord Morris*, ¶ 33.

10

¶ 20     While the crime of stalking under section 18-3-602(1)(c) may include the content of communications, "sometimes it is primarily or solely about the conduct itself." *Crawford*, ¶ 14.  In *Crawford*, the Colorado Supreme Court held that "stalking charges brought under section 18-3-602(1)(c), based on a repeated course of conduct, do not require proof that the defendant acted with a reckless mens rea." *Id.* at ¶ 9.  The court noted, however, "that First Amendment protections may extend to conduct that is sufficiently imbued with elements of communication." *Id.* at ¶ 18 (citation modified).  Courts are tasked with determining "whether there is an intent to convey a particularized message" and the likelihood that the message would be understood by the recipient. *Id.* (citation modified).

¶ 21     By agreeing to instruct the jury on true threats and related First Amendment principles — in addition to surveillance-based stalking — the trial court conceded that Sharpe's conduct was "imbued with elements of communication." *See id.*  While the court accurately instructed the jury on the law at the time, *Counterman*'s "recklessness" requirement is now the governing standard. *Counterman*, 600 U.S. at 69.  If our analysis stopped here, and if

11

the prosecution premised the charges on speech alone, Sharpe's conviction would require reversal because he was prosecuted under the outdated objective test. *See* § 18-1-410(1)(f)(I), C.R.S. 2025 (A defendant is entitled to retroactive application of a "significant change in the law.").

¶ 22     But this is not merely a true-threats case. Rather, it was prosecuted under a theory of repeated, unwelcome conduct. We are not convinced that the jury would have reached a different result had it been instructed that, to find Sharpe guilty of stalking, he had to have acted recklessly in uttering a true threat. Instead, the People presented overwhelming evidence that Sharpe repeatedly contacted and surveilled T.I., and focused closing argument on these contacts. *See Walker*, ¶¶ 23-25. More, Sharpe recruited others to connect with T.I. even after law enforcement reiterated that she did not welcome Sharpe's conduct. To the extent the People introduced the content of Sharpe's communications, this was necessary to prove the reasonableness of T.I.'s distress, as the statute requires. § 18-3-602(1)(c). We therefore conclude that any error in failing to provide a *Counterman* instruction was harmless beyond a reasonable doubt because the evidence the jury properly

12

received against Sharpe for surveillance-based stalking was overwhelming.  *See Walker*, ¶ 23.

## IV.   Disposition

The judgment is affirmed.

JUDGE KUHN and JUDGE SULLIVAN concur.